IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
March 2007

## DERRY LAVELLE LOVINS v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Dyer County**
**No. C02-40     Lee Moore, Judge**

---

**No. W2005-01446-CCA-R3-PC  - Filed September 14, 2007**

---

Following a jury trial, Petitioner was convicted of second degree murder and sentenced to twenty-three years in the Department of Correction.  On direct appeal, this Court affirmed his conviction. *State v. Derry Lavelle Lovins*, No. W2003-00309-CCA-R3-CD, 2004 WL 224482, at *1 -7 (Tenn. Crim. App., at Jackson, Feb. 4, 2004), *perm. app. denied* (Tenn. Mar. 5, 2007).  Petitioner then filed a *pro se* petition for post-conviction relief.  Petitioner was appointed counsel and an evidentiary hearing was held.  The trial court subsequently denied the petition and a timely notice of appeal was filed.  After a review of the record, this Court determined that Petitioner was entitled to a delayed appeal to our supreme court pursuant to Rule 11 of the Tennessee Rules of Appellate Procedure. The remaining post-conviction proceedings were stayed pending the delayed appeal.  On March 5, 2007, the supreme court denied Petitioner's delayed appeal.  We now address Petitioner's remaining claims for post-conviction relief.  Petitioner argues that he is entitled to post-conviction relief because (1) he received ineffective assistance of counsel, (2) his constitutional rights were violated by the State's failure to disclose physical evidence during discovery, (3) he was prejudiced by the trial judge's facial expressions, and (4) the jury reached a compromised verdict.  After a thorough review of the record, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and J. C. MCLIN, JJ., joined.

Stephen D. Scofield, Dyersburg, Tennessee, for the appellant Derry Lavelle Lovins.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; and C. Phillip Bivens, District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

## I. Background

The following facts were set forth by this Court in Petitioner's direct appeal:

Ashunn Harris testified that he knew the Defendant for about three or four years and knew the victim, Geoffrey Burnett, for about one year at the date of the killing, December 4, 2001. Harris testified that he was outside of his home, which was in close proximity to the murder scene, and noticed that the Defendant drove by his house in a green minivan four or five times during the day. Harris stated that both he and the victim were outside Harris['] house together when the Defendant drove by in his minivan. Harris testified that he and the victim left Harris['] house at 6:00 or 6:30 p.m. and that, when they left, it was dark outside. Harris stated that he and the victim left Harris['] house in the victim's car and that the victim was driving while Harris sat in the front passenger's seat. Harris testified that he and the victim picked up James "Splat" Barr, who got in the victim's vehicle and sat behind Harris. Harris stated that he did not see a gun in the vehicle.

Harris said that the three men were headed back to Harris['] house when they noticed the green minivan the Defendant was driving earlier. Harris stated that both cars stopped at a stop sign and rolled down the windows, and the victim and the Defendant "exchanged words." Harris stated that the Defendant asked the victim for "some change" and the victim said that "he didn't have [any] change for him . . . ." Harris testified that the two kept repeating these words with raised voices and the Defendant again asked the victim for "change" and the victim said, "The only way you're go[ing to] get the change is [if] you put a bullet in my head." Harris testified that, after the victim made this statement, he heard the Defendant's door open and then heard one shot, after which Harris "got down," and then he heard another shot. Harris stated that right after the shots were fired he heard the minivan pull away "real fast."

Harris stated that when he raised his head back up he noticed that the victim was "laid out" and bleeding. Harris opened his door, the window of which was "busted out," and ran and called an ambulance. Harris stated that he did not see a gun in the victim's possession at any time.

On cross-examination, Harris stated that, immediately prior to the shooting, the victim was about to open the door. He had cracked it open a little bit." Harris testified that he did not see the Defendant make any gesture towards the victim prior to the victim opening his car door. Harris also agreed that it was common knowledge in the community that the victim had acted violently towards other people in the past.

Harris stated that he heard about an incident in November 2001 when the victim went into an apartment and shot someone.

Billy Buck, an officer with the Dyersburg Police Department, testified that he was on patrol on December 4, 2001, and was the first officer to arrive on the scene of this shooting. The officer stated that, when he got to the scene, several people were surrounding the vehicle and the passenger window of the car was "shot out." The officer stated that blood covered the victim's face and it was apparent that he suffered a "serious wound." The officer stated that the passenger's side door was open and the driver's side door was shut. The officer stated that he checked the victim's car for weapons and did not find a gun, but he did find a cell phone in the victim's hand. The officer said that there were no passengers in the victim's car when he arrived. Officer Buck stated that the Defendant called the police department shortly after the shooting and reported that someone was chasing him in a vehicle. The officer noted that the description given by the Defendant matched the victim's vehicle, which was parked at the scene of the shooting.

On cross-examination, the officer admitted that he did not see any passengers in the vehicle when he got to the crime scene and that it was possible that either passenger could have removed items from inside the car, including a weapon, when they left.

Jim Gray, an investigating officer with the Dyersburg Police Department, testified that on December 4, 2001, he received a call to investigate a shooting. The officer stated that, when he arrived at the scene, he saw a maroon Pontiac with the victim inside. Officer Gray stated that there was a bullet hole in the center of the driver's side door, which was closed. The officer stated that the driver's side window was rolled down and the passenger's side door was open and the glass in the window was broken. The officer testified that he did not see any weapon in the victim's car but that he did see a cell phone lying in the victim's lap.

Officer Gray testified that he heard from the dispatcher that the Defendant advised the police that he had been in an altercation and shooting. The officer testified that he found the van that the Defendant was driving during the shooting and, after searching it, found three .357 live rounds and one glove. The officer testified that his investigation revealed that there were four men in the minivan with the Defendant at the time of the shooting: Josh Garrett, Dennis Akins, Billy Thompson, Jr., and Anthony Gooch. [There was some confusion as to whether this man's name was Anthony Gooch or Anthony Williams.] The officer testified that he also determined that there were two men in the car with the victim at the time of the shooting: James Barr and Ashunn Harris. On cross-examination, Officer Gray testified that the bullet hole in the door was about three or four feet below the victim's head.

Cynthia Gardner, an employee with the medical examiner's office, testified that she examined the victim's body and swabbed the victim's hands for gunshot residue. Gardner testified that the victim's gunshot wound was located just above his left ear. Gardner stated that, from the entrance wound, she determined that the gun was more than two feet away from the victim at the time that it was fired. Gardner determined that when the victim was shot he was looking straight ahead, and the bullet came from a perpendicular direction, entering the side of the victim's head.

Laura Hodge, a special agent forensic scientist for the Tennessee Bureau of Investigation, testified that the gunshot residue test performed on the victim was negative, indicating that there was no gunshot residue on the victim's hands.

John David Fisher, a bail bondsman, testified that he was familiar with the Defendant. Fisher stated that the Defendant called him at around one o'clock on the afternoon prior to the murder to ask if Fisher would be in town that evening because "he thought there may be a little trouble and just might need to make bond." Fisher testified that the Defendant told him that he might get in trouble for an assault and would call him if he needed him. Fisher stated that the Defendant called him later that day, around six or seven o'clock in the evening, and told him that he was on his way to turn himself in because someone had been shot.

On cross-examination, Fisher stated that the Defendant rented property from Fisher and that some of that property was subleased to the victim. Fisher testified that he was due some rent money on the property that was subleased by the victim. Fisher also stated that the Defendant told him that he was going to the police station because he had shot someone's door, but that he did not use the words murder or homicide.

Mark Reynolds, an officer with the Dyersburg Police Department, testified that he was called to the shooting scene on December 4, 2001, and that he tried to locate any witnesses among the people gathered there. Officer Reynolds testified that, later in the investigation, he learned that Josh Garrett was a passenger in the Defendant's minivan at the time of the shooting. Garrett took the officer to a location where Garrett said he disposed of the murder weapon, and, there, the officer located a .357 handgun in a ditch. Officer Reynolds stated that the gun had one spent round in the chamber and that he found a "live" cartridge on the road near where the weapon was found.

Billy Williams, an officer with the Dyersburg Police Department, testified that he was called to assist in investigating the shooting. Officer Williams stated that he interviewed the Defendant at eight o'clock on the evening of the shooting. The officer testified that he noticed that the Defendant was "very upset, very nervous, and just basically . . . shaken up." The officer informed the Defendant of his Miranda rights, after which the Defendant told the officer that "he had been into it with [the

victim]" and that he stopped his minivan next to the victim's car and words were exchanged. The officer stated that the Defendant told him that he was asking the victim for money and that the victim said, "The only way you'll get some money out of me is to shoot me in the head." Officer Williams testified that the Defendant stated that he thought the door was about to open "or he saw [the victim] move, and he fired two shots" and then "sped off." The officer stated that the Defendant told him that he never saw the victim with a gun.

The officer testified that the Defendant told him that Josh Garrett and Billy Thompson, Jr., were in the car with him at the time of the shooting. Officer Williams testified that Garrett told him that Garrett had a 9-millimeter handgun, and the investigation also revealed that the Defendant had a weapon. The officer testified that, once Garrett was released, he retrieved his 9 millimeter gun and turned it into the police. On cross-examination, the officer stated that he knew from the beginning of the investigation that there was an allegation that the victim began to open his door prior to the shooting. The officer also admitted that the Defendant told him that the victim's car "cut us off" prior to the two cars stopping at the stop sign and that the Defendant told him that there were two guns, "a 9 [millimeter] and a .357," in the car at the time of the shooting. Officer Williams testified that the Defendant told him that he saw the victim reach for something prior to the shooting. The officer testified that the Defendant told him that the victim was making threats to his life. The officer also stated that he was aware that two Dyersburg residents complained to police that the victim broke into their apartment and threatened them with a gun on December 12, 2000. Officer Williams testified that he knew the victim's mother because she was an officer with the Ripley Police Department.

The Defendant called Tammy Denise Smith who testified that she knew the Defendant from a business that he owned and operated. Smith testified that she also knew the victim for approximately two years prior to his death. Smith stated that the victim told her on the day of the murder that, when he found the Defendant, he was going to kill him. She testified that the victim had a reputation for violence in the community. Smith testified that she told the Defendant that she heard the victim threaten the Defendant's life. Smith stated that, on one occasion, she saw the victim pull a gun on the Defendant's brother and "just poin[t] the gun at him . . . ." On cross-examination, Smith admitted that she did not mention her conversation with the victim, in which he threatened the Defendant's life, when she testified on the Defendant's behalf at any previous hearings.

Natasha Spain, the victim's girlfriend, testified that she knew the Defendant and that she was living with the victim at the time of his death. Spain testified that she was working at the time of the murder and that the victim had driven her to work. She stated that the victim told her on the day of the murder that he was going to go to Ripley and get a gun, and Spain understood the victim to mean that he was going to

get the gun "to take care of a problem" that he was having with the Defendant. Spain stated that she told the victim to stay away from the Defendant. On cross-examination, Spain admitted that, shortly after the murder, she told investigators that the Defendant called her prior to the shooting, while she was with the victim, and asked her to "[p]ut your b* * * * a* * n* * * *  on the phone," referring to the victim. She stated that the victim spoke with the Defendant, who was asking the victim for money, and he told the Defendant to subtract the money that he owed the Defendant from the money the Defendant owed him and then inform him of the balance.

Kim Floyd testified that she told the Defendant that the victim was a violent and dangerous person prior to the night of the shooting.

Billy Ray Thompson testified that he was a passenger in the minivan driven by the Defendant on the night of the shooting. He testified that he was sitting behind the driver in the back seat and that, in addition to the Defendant, two other men, Josh Garrett and Dennis Akins, were in the minivan. Thompson testified that the Defendant did not mention the victim while they were in the car together prior to the shooting. Thompson stated that they saw the victim's car at a four-way stop and that the Defendant backed the van up to the victim's car and the two men started talking. He said that the Defendant asked the victim for money and the victim responded, "If you can do your math, then you would know that I don't owe you [anything]," and the victim got upset and "started hollering." Thompson stated that the Defendant was not upset at all. Thompson testified that he saw the victim reaching "on the side of him like he was [getting ready to] get a gun." Thompson said that the victim opened his driver's side door halfway and looked as if he was going to get out of his car. Thompson testified that he thought that the victim was about to "talk crazy, or shoot at us, or something." He testified that the victim previously "pulled a gun" on him one week prior to the shooting.

On cross-examination, Thompson testified that he heard the victim tell the Defendant, "To get your money, you're go[ing to] have to put one in my head" and that, shortly thereafter, he heard two gunshots and the Defendant drove away. Thompson stated that the Defendant fired the gun. Thompson stated that the Defendant then immediately called the police and said, "I just shot someone and I need for y'all to come meet me on the highway because he's still chasing me."

The Defendant next called Officer Jim Gray to testify again. Officer Gray stated that, when he examined the victim's vehicle at the crime scene, it was in park. The officer testified that the bullet hole in the driver's side door was significantly lower than where the victim's torso would have been located had he been sitting behind the steering wheel.

Carey Brown Haynes testified that he was familiar with both the Defendant and the victim. Haynes testified that the victim shot him in the left ear and the head and that the Defendant was aware of this. Haynes stated that, when the victim shot him, he was sitting at his house and the victim "came and kicked in the door of the house" and then shot him. On cross-examination, Haynes testified that he told the police that the victim shot him.

Officer Billy Williams was called again to testify and stated that he interviewed Haynes when Haynes was shot on December 12, 2000. He stated that Haynes never told him that the victim shot him, and only told him that the individual who shot him had on a mask and that Haynes did not know who that individual was. Officer Williams stated that, during the investigation, the victim was a possible suspect and was interviewed, but there was insufficient evidence to charge him with the crime. The officer stated that when Haynes was shot he was living with both the Defendant and the victim. Officer Williams testified that he did not execute a search warrant in that case and denied that it was because he had a good working relationship with the Defendant's mother.

The Defendant testified on his own behalf that he owned and operated a business named Auto Source for several years and that he owned it on the day of the shooting. The Defendant testified that he knew the victim for approximately three years prior to the shooting. The Defendant stated that, prior to the shooting, the victim was "having words and disagreements" with at least six of their mutual acquaintances. The Defendant testified that, before the shooting, he learned from "quite a few people" that the victim was making threats against his life. Specifically, the Defendant was told that the victim said, "If he s[aw] me, he was go[ing to] kill me." The Defendant testified that these threats concerned him and he felt that the victim really was going to kill him. The Defendant said that, on the day of the shooting, Tammy Smith told him that the victim told her that the victim was going to kill the Defendant. The Defendant testified that he had been told that the victim was involved in previous shootings.

The Defendant testified that, on the night of the murder, the victim's vehicle was blocking his vehicle and that he put his vehicle in reverse. The Defendant said that the victim then backed up the victim's vehicle so that the two cars were side by side. The Defendant testified that, after the victim blocked his car, the Defendant knew there was "going to be trouble." The Defendant testified that the victim asked him, "What's up" and did not appear "upset or anything." The Defendant stated that he wanted to see what was "going on" because people had been telling him that the victim was going to try to kill him, but he had seen the victim multiple times that evening and he did not attempt to stop the Defendant. The Defendant stated that the victim then "got real upset" but that he did not know why. He testified that the

victim did not say anything about putting a bullet in the victim's head as the other witness said but said that there was "go[ing to] be some killin[g]."

The Defendant stated that the victim appeared to be excited and "started reachin[g]" for a gun, so the Defendant reached for his gun. The Defendant stated that he never saw a gun in the victim's hand but knew that he regularly carried a weapon. The Defendant stated that, after he reached for his gun, the Defendant immediately fired a shot and, as he was driving off, he fired another shot. He said that he fired his gun at the victim just to warn him and that he did not know that the victim had been shot when he drove away. The Defendant testified that he then called the police and told them that he thought that he might have shot someone and that someone might still be following him. The Defendant said that he told police that he had two guns in the minivan and that he left the guns in the minivan. The Defendant stated that he carried a gun with him because he often carried large sums of money from his store.

On cross-examination, the Defendant stated that he and the victim formerly lived in close proximity to each other. The Defendant stated that, five days prior to the murder, he and the victim drove to Jackson, Tennessee, together and did not have any problems. The Defendant testified that, on the day of the murder, he picked up his cousin, Josh Garrett, and that Garrett had a gun "on him." The Defendant stated that the two men saw the victim a couple of times while driving around and, since the victim did not stop them, they assumed that there was not going to be a problem, so they placed both guns on the floor of the minivan. The Defendant testified that, when he and the victim were in their respective vehicles next to each other, the victim stated that he did not have a problem with the Defendant and then told the Defendant that he was friends with Officer Williams and could not get in trouble. The Defendant stated that, during this time, he "wasn't saying a word." The Defendant admitted that there was some discussion about money, stating, "I asked him about the money after he was starting to get riled up."

The Defendant stated that he asked the victim for money because "[a]t that point in time, I didn't think he had a gun." The Defendant testified that the victim then said "something about some kill[ing]" and the victim reached down inside his car. The Defendant stated that the victim put his cell phone on the dash, put the car in park, opened the door and was reaching down when the Defendant fired the first shot. The Defendant explained that he did not know where the victim was when he fired the second shot because he was driving off as he fired it. The Defendant testified that he did not know if there was anything that prevented him from driving off prior to shooting the victim. The Defendant stated that, when he left the scene of the shooting, he drove the opposite direction from the sheriff's department. The Defendant testified that he left the minivan and asked someone to come pick him up because he thought that someone was following the minivan. He stated that he left his cousin and another man in the minivan and that he left the guns in the minivan.

The State called one rebuttal witness, Rita M. Burnett, who was the victim's mother and is an officer with the Ripley Police Department. Officer Burnett testified that she had known Officer Williams since 1999 and that he called her one time because her son, the victim, was implicated in a shooting. Officer Burnett stated that she has four sons, two of whom are in prison, the victim, and a fifteen year old son. The officer testified that the victim would "physically figh[t]," but that she had never known him to be charged with using a weapon.

*State v. Derry Lavelle Lovins*, No. W2003-00309-CCA-R3-CD, 2004 WL 224482, at *1 -7 (Tenn. Crim. App., at Jackson, Feb. 4, 2004)*, perm. app. denied* (Tenn. Mar. 5, 2007).

## II. Post-Conviction Hearing

At the post-conviction hearing, Petitioner testified that his trial counsel was ineffective for failing to call Larry Nolen, Joshua Garrett, and James "Splat" Barr to testify at trial. Petitioner said Larry Nolen was present in the courtroom during the trial and available to testify. Petitioner stated that Joshua Garrett was incarcerated for aggravated robbery and attempted murder at the time of trial. He acknowledged that the jury would have been made aware of this fact, but maintained that Mr. Garrett was an important witness and should have been called to testify. Petitioner testified that James Barr was a "material witness" who had been subpoenaed to testify, but did not appear at trial. He said that counsel was ineffective for failing to request a continuance to secure Mr. Barr's presence.

Petitioner next testified that counsel was ineffective for failing to appeal the exclusion of portions of Kim Floyd's testimony. Specifically, Petitioner said that Ms. Floyd should have been allowed to testify that the victim was involved in a shooting at Ms. Floyd's apartment which resulted in the death of her daughter. He acknowledged that Ms. Floyd did testify at trial regarding the victim's reputation for violence and the fact that she had warned Defendant of this tendency. Petitioner also testified that counsel was ineffective because he failed to give Petitioner an opportunity to clarify with the jury what Petitioner perceived as mistakes in his police statement. Finally, Petitioner testified that trial counsel was ineffective for failing to appeal his case from the state appellate court to the state supreme court. Petitioner said that he wrote counsel a letter requesting that he appeal the case to the supreme court, but never heard back from him. Petitioner did not have a copy of the letter. He admitted that he did not pay trial counsel any money to appeal to the supreme court, but stated that counsel was appointed to do so.

In addition to his testimony regarding ineffective assistance of counsel, Petitioner testified that his sentence was unconstitutional; that the jury reached a compromised verdict; that the trial judge made facial expressions which could have influenced the jury; that Ms. Athalene King was unconstitutionally excluded from the jury; and the State withheld physical evidence containing gloves and other items prior to trial. Petitioner also stated that the evidence at trial was insufficient to support his conviction because there was no evidence that he fired the shot that killed the victim. He admitted this issue was raised on direct appeal.

Petitioner's trial counsel testified that he did not appeal the exclusion of Ms. Floyd's testimony because he felt the relevant portions of her testimony were admitted into evidence. Specifically, her testimony was admitted regarding the victim's reputation for violence and the fact that she warned Defendant of this reputation. Trial counsel said the victim's violent nature was "sufficiently clear" from the trial testimony. He explained that the record was replete with testimony from several witnesses who attested to the victim's violent nature, including the victim's girlfriend. He said the girlfriend testified that the victim discussed killing Defendant and purchased a gun on the day of the incident to use in carrying out his plan. Trial counsel said the witnesses were "strong," and the State did not impeach their testimony. Trial counsel did not recall a witness named Larry Nolen.

With respect to James "Splat" Barr, trial counsel testified that in retrospect, it would have been a "good idea" to move for a continuance to secure Mr. Barr's testimony. He explained that there was some "street talk" that Mr. Barr removed a gun from the victim's automobile following the incident. Trial counsel said that if the "street talk" was true, Mr. Barr's testimony would have been helpful to Petitioner's case since the theory of his case was self-defense or accidental killing, and no gun was recovered from the victim's person or his car. According to trial counsel, neither he nor the State had the opportunity to interview Mr. Barr. There was also some question as to whether Mr. Barr had been properly served with a subpoena to appear in court.

Trial counsel testified that he chose not to call Joshua Garrett to testify because he thought Mr. Garrett would be a "terrible" witness and would hurt Defendant's case. Mr. Garrett was incarcerated for aggravated robbery and attempted murder at the time of trial and had a violent criminal history. Trial counsel explained that Mr. Garrett's testimony was not particularly helpful, rather, it merely corroborated the other witnesses' testimony regarding the events leading up to the shooting. In light of his criminal background, trial counsel determined that Mr. Garrett's testimony was not worth the damage it would cause Petitioner's case.

Trial counsel said that he did not appeal Defendant's sentence because, although he thought the sentence was excessive under the facts, there was no error in sentencing and no grounds for appeal. Trial counsel had no recollection of a letter from Petitioner requesting that he seek an appeal to the supreme court. Trial counsel did not recall a pair of gloves or a box of physical evidence being introduced by the State the day of trial. He likewise did not recall interviewing jurors or having information that the jury's verdict had been compromised.

## III. Analysis

### A. Standard of Review

To sustain a petition for post-conviction relief, a defendant must prove his or her factual allegations by clear and convincing evidence at an evidentiary hearing. *See* T.C.A. § 40-30-110(f); *Momon v. State,* 18 S.W.3d 152, 156 (Tenn. 1999). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and

value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *See Momon,* 18 S.W.3d at 156; *Henley v. State,* 960 S.W.2d 572, 578-79 (Tenn. 1997). The trial judge's findings of fact on a petition for post-conviction relief are afforded the weight of a jury verdict and are conclusive on appeal unless the evidence preponderates against those findings. *See Momon,* 18 S.W.3d at 156; *Henley,* 960 S.W.2d at 578.

## B. Ineffective Assistance of Counsel

In his first three issues on appeal, Petitioner contends that he is entitled to post-conviction relief because trial counsel was ineffective in (1) failing to appeal the exclusion of portions of Kim Floyd's testimony; (2) failing to call Larry Nolen, Joshua Garrett, and James Barr to testify at trial, (3) failing to request a continuance in order to secure James Barr's presence to testify, and (4) failing to give Petitioner an opportunity to explain his police statement to the jury.

To succeed on a challenge of ineffective assistance of counsel, the petitioner bears the burden of establishing the allegations set forth in his petition by clear and convincing evidence. T.C.A. § 40-30-110(f) (2003). The petitioner must demonstrate that counsel's representation fell below the range of competence demanded of attorneys in criminal cases. *Baxter v. Rose,* 523 S.W.2d 930, 936 (Tenn. 1975). Under *Strickland v. Washington,* 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984), the petitioner must establish (1) deficient performance and (2) prejudice resulting from the deficiency. The petitioner is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State,* 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). This deference to the tactical decisions of trial counsel is dependent upon a showing that the decisions were made after adequate preparation. *Cooper v. State,* 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

It is unnecessary for a court to address deficiency and prejudice in any particular order, or even to address both if the petitioner makes an insufficient showing on either. *Strickland,* 466 U.S. at 697, 104 S. Ct. at 2069. In order to establish prejudice, the petitioner must establish a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Burns,* 6 S.W.3d 453, 463 (Tenn. 1999) (quoting *Strickland,* 466 U.S. at 694, 104 S. Ct. at 2068). The issues of deficient performance by counsel and possible prejudice to the defense are mixed questions of law and fact. *Id.* at 461. "[A] trial court's findings of fact underlying a claim of ineffective assistance of counsel are reviewed on appeal under a *de novo* standard, accompanied with a presumption that those findings are correct unless the preponderance of the evidence is otherwise." *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001) (citing Tenn. R. App. P. 13(d); *Henley*, 960 S.W.2d at 578). However, conclusions of law are reviewed under a purely *de novo* standard with no presumption that the post-conviction court's findings are correct. *Id.*

## 1. Exclusion of Evidence

Petitioner first claims that trial counsel was ineffective in failing to appeal the exclusion of testimony from Ms. Floyd. Specifically, Petitioner argues that Ms. Floyd should have been permitted to testify that the victim participated in a shooting crime against her which resulted in injury to herself and the death of her two-year-old child. The trial transcript reflects that in a jury-out hearing, Ms. Floyd testified that she told Petitioner that the victim was a violent person who would turn on him. Ms. Floyd told Petitioner she had seen something similar happen eight years earlier when her door was kicked in and "they killed my friend, shot me bad, left me in bad shape and killed my two year old daughter." Ms. Floyd testified that the victim's brother was convicted of the crime, but it was her understanding that the victim was the person who kicked in her door. The trial court permitted the testimony regarding the victim's reputation, but did not allow any evidence of the prior event.

Initially, we note that counsel's choices as to the issues to raise on appeal are generally entitled to substantial deference. *Strickland,* 466 U.S. 689, 104 S. Ct. at 2065. Our supreme court has stated that counsel on appeal has no obligation to raise every conceivable argument which might be made. *Carpenter v. State,* 126 S.W.3d 879, 887 (Tenn. 2004) (citing *King v. State,* 989 S.W.2d 319, 334 (Tenn. 1999)). This Court has further stated that "ineffectiveness is very rarely found in cases where a defendant asserts that appellate counsel failed to raise an issue on direct appeal, primarily because the decision of what issues to raise is one of the most important strategic decisions to be made by appellate counsel." *Kennath Henderson v. State,* No. W2003-01545-CCA-R3-PD, 2005 WL 1541855, at *44 (Tenn. Crim. App., at Jackson, June 28, 2005) *perm. to appeal denied*, (Tenn. Dec. 5, 2005).

The post-conviction court found no evidence that counsel was ineffective in failing to appeal the exclusion of Ms. Floyd's testimony. The court stated that even if counsel's actions were ineffective, Petitioner failed to demonstrate prejudice. We see nothing in the record to preponderate against the trial court's findings. Trial counsel testified that he saw no reason to appeal the exclusion of evidence given the testimony from numerous other witnesses regarding the victim's violent tendencies. Trial counsel found it particularly noteworthy that the victim's girlfriend testified regarding the victim's violent nature and his intention to kill Petitioner. Trial counsel said he thought the evidence that was admitted made it "sufficiently clear how bad [the victim] was." We cannot conclude that counsel's failure to appeal the exclusion of evidence was anything other than reasonable appellate strategy. Furthermore, Petitioner has not shown how he was prejudiced by the exclusion of evidence. As such, Petitioner is not entitled to relief on this issue.

## 2. Failure to Call Witnesses

Petitioner next argues that trial counsel was ineffective for failing to call Larry Nolen, Joshua Garrett, and James Barr to testify at trial, and failing to request a continuance in order to secure James Barr's presence to testify. Petitioner asserts that Larry Nolen was in court on the day of trial, Joshua Garrett was in the county jail, and both men were readily available to testify. Both Mr. Barr

and Mr. Garrett's statements were introduced as exhibits at the post-conviction hearing. Petitioner argues that counsel was particularly ineffective in failing to call James Barr to testify. He claims that Mr. Barr removed a gun from the victim's vehicle following the shooting and his testimony in this regard would have supported Petitioner's theory of self-defense. The post-conviction court found that Petitioner failed to demonstrate how he was prejudiced as a result of trial counsel's decision not to call these witnesses and not to request a continuance. The court reviewed Mr. Barr's statement to police and found nothing in the statement that would have been beneficial to Petitioner at trial. The court also found that trial counsel made a strategic, informed decision not to call Joshua Garrett as a witness.

We agree with the post-conviction court. Trial counsel testified that he did not recall a witness named Larry Nolen and did not remember discussing this individual with Petitioner. He said that he chose not to call Joshua Garrett to testify given his violent criminal history and the fact that he was incarcerated for aggravated robbery and attempted murder. With respect to James Barr, trial counsel stated that a continuance might have been beneficial to Petitioner's case provided (1) Mr. Barr could be located and subpoenaed, and (2) Mr. Barr then testified that he had taken a gun from the victim's vehicle after the shooting. At the time of trial, however, Mr. Barr could not be located, and neither the State nor defense counsel had reliable information that Mr. Barr could testify to this effect. Mr. Barr did not testify at the post-conviction hearing regarding what his trial testimony might have been. Nor was there any discussion or explanation from Petitioner as to why Mr. Barr was not called to testify at the hearing. There is nothing in Mr. Barr's statement, which was introduced as an exhibit at the post-conviction hearing, indicating that he removed a gun from the victim or his car following the shooting. As such, there is nothing to indicate the outcome of Petitioner's trial would have been different had Mr. Barr testified. Larry Nolen likewise did not testify at the hearing, and Petitioner offered no evidence as to why Mr. Nolen was not called or what he might have said had he been called at trial. Without such evidence, we cannot conclude that Petitioner was prejudiced by trial counsel's failure to call Mr. Barr or Mr. Nolen. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Finally, as noted by the trial court, trial counsel made a reasonable, strategic decision not to call Mr. Garrett to testify given his criminal background. This is a decision we will not second-guess. Accordingly, Petitioner is not entitled to relief on this issue.

### 3. Statement

Petitioner also contends that counsel was ineffective in failing to allow him to explain his prior statement to police to the jury. Petitioner testified that the transcribed version of his statement to police appeared to say that he did not like Josh Garrett. Petitioner wanted to clarify at trial that what he actually said was "he did not like the way [the victim] treated Josh, not that he didn't like Josh." Petitioner asserts that trial counsel was ineffective for failing to give him an opportunity to make this clarification at trial. Petitioner presented no evidence at the post-conviction hearing to indicate how he was prejudiced by the alleged error in the statement or trial counsel's failure to give him an opportunity to clarify the error. Nor is there anything in the record to indicate that counsel's

performance was deficient in this regard. In our view, Petitioner has failed to meet his burden of proof and is not entitled to relief on this issue.

### C. Blakely Violation

In his next argument, Petitioner contends that his sentence was unconstitutionally enhanced in violation of *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004). Petitioner argues that had his sentence been appealed at the time of his direct appeal, which occurred prior to our supreme court's decision in *State v. Gomez*, 163 S.W.3d 632 (Tenn. 2005), the sentence would have been illegal under *Blakely* since the enhancement factors were not found by a jury.

In *Blakely*, the United States Supreme Court concluded that the "'statutory maximum' for *Apprendi* [*v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348 (2000),] purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant. *Blakely*, 542 U.S. at 303, 124 S. Ct. at 2537. Subsequent to that decision, our supreme court decided *State v. Gomez*, in which a majority of the court concluded that, unlike the sentencing scheme in *Blakely*, "Tennessee's sentencing structure does not violate the Sixth Amendment." *Gomez*, 163 S.W.3d at 661. However, the United States Supreme Court recently vacated our supreme court's ruling in *Gomez* and remanded the case for reconsideration in light of its recent decision in *Cunningham v. California*, 549 U.S. ____, 127 S. Ct. 856 (2007). Thus, we no longer follow *Gomez* given the Supreme Court's instruction. *State v. James A. Mellon*, No. E2006-00791-CCA-R3-CD, 2007 WL 1319370, *9 (Tenn. Crim. App., at Knoxville, May 7, 2007) (no Tenn. R. App. 11 application filed). In the present case, Petitioner raised the issue in a collateral attack. This Court has previously held that retrospective application of the rule announced in *Blakely* is not applicable to cases on collateral review. *Roy Allen Burch v. State*, No. E2004-02365-CCA-R3-PC, 2005 WL 1584379, *2 (Tenn. Crim. App., at Knoxville, July 7, 2005) (no Tenn. R. App. P. 11 application filed) (citing *Isaac Lydell Herron v. State*, No. W2004-02533-CCA-R28-PC (Tenn. Crim. App., at Jackson, Nov. 22, 2004)). Petitioner is not entitled to relief on this issue.

### D. Pre-trial Disclosure of Evidence

In his next argument, Petitioner contends that he was denied his right to pre-trial disclosure of evidence. Specifically, Petitioner asserts that, during discovery, the prosecution withheld a box of physical evidence containing, among other things, a pair of gloves which were displayed to the jury during his trial. Petitioner contends that the failure to disclose this evidence denied him his constitutional right to a fair trial. Petitioner cites only his own testimony at the post-conviction hearing in support of his argument. Trial counsel testified that he had no recollection of a box of evidence or a pair of gloves. The trial transcript reflects that one brown work glove and a box of ammunition were recovered from the Petitioner's van. The items were introduced as an exhibit at trial. Trial counsel affirmed that he had seen the items and did not object to their introduction into evidence. The post-conviction court found that Petitioner offered no proof that the physical evidence existed or that the State failed to disclose the alleged evidence prior to trial. The evidence does not preponderate against the trial court's findings. Petitioner is not entitled to relief on this issue.

-14-

## E. Judicial Prejudice

Petitioner next argues that the trial judge made certain facial expressions during the trial that were prejudicial to Petitioner's case and denied him his constitutional right to a fair trial. Petitioner offers no proof in support of his argument. The trial transcript shows that trial counsel, out of the presence of the jury, stated that the trial judge made a facial expression while ruling on a matter of evidence. Trial counsel was not sure if the jury saw the facial expression, but felt it was prejudicial nonetheless and deprived Petitioner of his right to a fair trial. The trial court allowed counsel's statement for the record, but did not comment on any potential prejudice and stated that the record would speak for itself. The court later instructed the jury that its rulings on matters of evidence were not a reflection of the court's opinions about the facts of the case or what the jury's verdict should be. The post-conviction court found no basis for this allegation of prejudice and stated that "the record of the testimony adequately indicates that the Court was correcting trial counsel after the Court had made a ruling and trial counsel was continuing to argue his point." In any event, the court found that the issue was waived because Petitioner had failed to properly raise it on direct appeal and it was not proper in a petition for post-conviction relief. We see nothing in the record to preponderate against the findings of the post-conviction court. Petitioner is not entitled to relief on this issue.

## F. Compromised Verdict

Petitioner next argues that the jury reportedly reached a compromised verdict. Once again, Petitioner offered no proof at the post-conviction hearing to support this contention. The post-conviction court found no evidence of a compromised verdict at the hearing or in the trial record. To the contrary, the post-conviction court found that the jury was polled regarding the verdict, and the verdict was unanimous. The post-conviction court cited to the following portion of the transcript:

THE COURT:     Has the jury reached a verdict?

JUROR:     Yes, sir.

THE COURT:     If you would, would you pass it up here, please, ma'am? All right, the jury verdict form reads as follows: "We, the jury, find as follows: Guilty of second degree murder."

Is this the decision of each and every one of you? If it is, would you raise your right hand? Let the record show that it's a unanimous decision from the jury.

Is there anything that we need to do now before we dismiss the jury?

[TRIAL COUNSEL]: No, Your Honor.

[PROSECUTOR]: No, Your Honor.

It is clear from the transcript that the jury's verdict was unanimous. We therefore conclude this issue is without merit. Petitioner is not entitled to relief.

## CONCLUSION

For the foregoing reasons, the judgment of the post-conviction court is affirmed.

_____
THOMAS T. WOODALL, JUDGE